UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

UNITED STATES OF AMERICA,

   – against –

AVRAHAM TARSHISH a/k/a AVI TARSHISH,

               Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
19-CR-408 (MKB)

MARGO K. BRODIE, United States District Judge:

On September 6, 2019, a grand jury returned an indictment against Avraham Tarshish,[1] charging him with two counts of conspiracy to commit wire and bank fraud in violation of 18 U.S.C. §§ 1349 and 3551 *et seq.*, and four substantive counts of wire fraud related to specific transactions in violation of 18 U.S.C. §§ 1343, 2, and 3551 *et seq.*[2] (Indictment ("Ind.") ¶¶ 36– 42, Docket Entry No. 1; Grand Jury Investigations Covering Mem., annexed to Ind. as Ex. 3, Docket Entry No. 1-3.) Trial commenced on November 4, 2024, and the government rested its case on November 19, 2024. (Trial Tr. 301:16–17, 2520:6; Min. Entry dated Nov. 4, 2024; Min. Entry dated Nov. 19, 2024.)[3] At the close of the government's case, Tarshish orally moved for a

---

[1] The grand jury also returned the indictment against codefendants Iskyo Aronov, Michael Konstantinovskiy, Michael Herskowitz, and Tomer Dafna, all of whom have pleaded guilty to conspiracy to commit wire and bank fraud. (Min. Entry dated July 11, 2022; Min. Entry dated June 27, 2024; Min. Entry dated July 29, 2024; Min. Entry dated Oct. 24, 2024.)

[2] The Indictment was unsealed on September 12, 2019. (Order dated Sept. 12, 2019, Docket Entry No. 8.)

[3] "Trial Tr." refers to the consecutively paginated trial transcripts dated November 4, 2024, through November 20, 2024. (*See* Nov. 4 Trial Tr. 1–304; Nov. 5 Trial Tr. 305–554, Docket Entry No. 415; Nov. 6 Trial Tr. 555–789, Docket Entry No. 416; Nov. 7 Trial Tr. 790–

judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, which the

Court denied.  (Trial Tr. 2521:10–11, 2524:14–18.)  Following a twelve-day trial, the jury found

Tarshish guilty on all counts.  (*Id.* at 2872:11–2875:22; Min. Entry dated Nov. 21, 2024; Verdict

Sheet, Docket Entry No. 417.)  Tarshish renewed his motion for a judgment of acquittal after the

jury's verdict and filed a written motion on December 5, 2024.  (Def.'s Mot. for Acquittal

("Def.'s Mot."), Docket Entry No. 424.)

       For the reasons discussed below, the Court denies Tarshish's motion for judgment of

acquittal.

## I.  Background

### a.  Indictment allegations

       According to the Indictment, from approximately December of 2012 to January of 2019,

Tarshish worked "to purchase hundreds of properties at fraudulently depressed prices and then

resell or 'flip' the properties for large profits."  (Ind. ¶ 18.)  The Short Sale Schemes "originated

at [My Ideal Property ("MIP")] under the direction of . . . [Aronov] with the assistance of . . .

[Tarshish], Short-Sale Co-Conspirators 1, 2 and 3, and others" (the "MIP Scheme") and the MIP

Scheme was later replicated by Tarshish "at Exclusive Homes with the assistance of Short-Sale

Co-Conspirator 2 and others" (the "Exclusive Homes Scheme").  (*Id.* ¶ 19.)

       The Indictment alleges that Tarshish conspired to defraud lenders and certain borrowers

by "providing them with false, misleading, and incomplete information to induce them to

execute short sales at fraudulently depressed prices, thereby causing losses to the lenders and, at

---

985; Nov. 8 Trial Tr. 986–1201; Nov. 12 Trial Tr. 1202–1461; Nov. 13 Trial Tr. 1462–1750;
Nov. 14 Trial Tr. 1751–2028; Nov. 18 Trial Tr. 2029–2329; Nov. 19 Trial Tr. 2330–2539,
Docket Entry No. 410, Nov. 20 Trial Tr. 2540–2779, Docket Entry No. 411; Nov. 21 Trial Tr.
2780–2881, Docket Entry No. 412.)

times, the borrowers . . . ." (*Id.* ¶ 18.) Tarshish and others "typically promised to pay or paid the borrower money to induce him or her also to sign (a) an agreement with a real estate broker to list the property for sale; (b) an authorization to allow a third-party negotiator to negotiate the short sale with the lender on the borrower's behalf; and (c) a contract to sell the property to a corporate entity controlled by the Short Sale Co-Conspirators," (*id.* ¶ 20), and that "[a]fter the borrower agreed to participate in a short sale of a property with the Short Sale Co-Conspirators, the Short Sale Co-Conspirators often took control of the property, evicted or paid any tenants living in the property to move out and, on occasion, arranged to damage the property to lower its appraised value," (*id.* ¶ 21).

**b.  Tarshish's *Ciminelli* motion**

On October 16, 2023, Tarshish filed a motion to dismiss the indictment on the grounds that the wire fraud allegations as charged fail to state an offense after the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306, 308 (2023).[4] (Defs.' Joint Mot. to Dismiss; Defs.' Mem. in Supp. of Defs.' Joint Mot. to Dismiss.) The Court denied Tarshish's motion to dismiss and found (1) that the Indictment does not allege a right-to-control theory of wire fraud, and (2) the Indictment alleges that Tarshish and others schemed to defraud others of money and real property based on false or fraudulent pretenses, rather than solely depriving the victims of valuable economic information. (*See* Feb. 2024 Decision, Docket Entry No. 307.)

**c.  Evidence at trial**

At trial, the government's evidence included (1) the testimony of Collin Zacek, Gina Feezer, and Dean Meyer regarding lender's expectations as to short-sale transactions, (*see* Trial

---

[4] Tarshish filed this motion to dismiss jointly with Dafna, Herskowitz, and Konstantinovsky. (Defs.' Joint Mot. to Dismiss, Docket Entry No. 299-1; Defs.' Mem. in Supp. of Defs.' Joint Mot. to Dismiss, Docket Entry No. 299.)

Tr. 1025:16–1026:16, 1031:6–1033:14, 1036:10–1037:20, 1051:7–1052:12, 1217:24–1218:22, 1221:3–1222:3, 1226:22–1227:5, 1354:12–15, 2045:11–19); (2) the testimony of Iskyo Aronov and Christina Catarelli regarding Tarshish's efforts to obtain short sale properties from loan lenders by misrepresenting payment amounts on HUD-1 forms and misrepresenting the arms-length nature of short sale transactions on loan forms, (*see id.* at 383:4–20, 395:20–22, 421:2–422:1,  450:15–453:13, 516:5–18, 623:13–624:4, 1601:1–14, 1653:3–16, 1648:11–13, 1652:17–24; *see also* GX 4275); (3) the testimony of Belinda Brandimarti and Emilienne Brown regarding Tarshish's efforts to fraudulently depress the property value of the transactions, (*see* Trial Tr. 1850:1–3, 1880:3–1881:17, 1357:9–23); and (4) testimony from homeowners regarding the payments they received or were offered from agents affiliated with My Ideal Properties and Exclusive Homes, (*see id.* at 974:4–975:2, 978:25–979:4, 2154:22–24, 21567:1–2159:4).

Collin Zacek, a representative from mortgage lender Fannie Mae, testified that Fannie Mae expected full transparency in short sale transaction applications and would decline applications involving fraud.  (*Id.* at 1032:3–7 ("A [Fannie Mae] expectation is full transparency and disclosure in all things. Q And in 2014, what did Fannie do when it discovered fraud in a short sale application?  A We would decline the application.").)  Similarly, Gina Feezer, a representative from Ocwen Financial Corporation, testified that Ocwen required homeowners to market their homes as part of the short sale process, (*id.* at 1218:12–14), and that the affidavits submitted in connection with the short sale were truthful, (*id.* at 1221:3–1222:3).  In addition, Dean Meyer, a representative from Freddie Mac, testified that Freddie Mac wants to "make sure the house is evaluated, make sure that it's marketed, [and] make sure that all of the financial terms of that [short sale] contract are identified and publicly stated on that HUD-1 statement" in order "to ensure [Freddie Mac is] losing as little money as possible."  (*Id.* at 2045:13–19.)

Despite the lender's expectations, Aronov, Tarshish's codefendant, testified that "[they] paid homeowners money that the bank wasn't aware of," (*id.* at 383:6–7), "would flip properties the same day at the table for profit," (*id.* at 383:9–10), and split the profits, (*id.* at 517:5–9). Aronov also testified that Eliya Properties, "a company that Avi Tarshish owns," bought a deed to a short sale property from a homeowner, (*id.* at 684:14–685:5), and Emilienne Brown, Tarshish's employee at My Ideal Properties and Exclusive Homes, testified that "deeds were being transferred to ensure that . . . the short sale could be . . . processed all the way to the finish line without transferring hands to someone that [they] had no control over," (*id.* at 1527:7–10).

### d. Rule 29 Motion

At the close of the government's case, Tarshish moved for a judgment of acquittal pursuant to Rule 29, which the Court denied. (*Id.* at 2521:9–11, 2524:14–18.) The jury found Tarshish guilty on all counts. (*Id.* at 2872:11–2875:22; Min. Entry dated Nov. 21, 2024; Verdict Sheet.) At the end of trial, Tarshish requested additional time to file a renewed motion for judgment of acquittal. (Trial Tr. 2878:19–2879:5.) Tarshish proposed a deadline of December 5, 2024 for his renewed motion, and the Court adopted Tarshish's proposed deadline. (Letter dated Nov. 26, 2024, Docket Entry No. 423; Min. Order dated Nov. 27, 2024.) On December 5, 2024, Tarshish filed a written renewed motion for a judgment of acquittal in which he declined "to make additional arguments regarding his motions for judgment of acquittal . . . ." (Def.'s Mot.) The government did not file any additional briefing.

## II. Discussion

### a. Standard of review

Rule 29 provides, in relevant part, that:

> [a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to

> sustain a conviction.  The court may on its own consider whether
> the evidence is insufficient to sustain a conviction.  If the court
> denies a motion for a judgment of acquittal at the close of the
> government's evidence, the defendant may offer evidence without
> having reserved the right to do so.

Fed. R. Crim. P. 29(a); *United States v. Pugh*, 945 F.3d 9, 19 (2d Cir. 2019).  "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 318 (1979); *United States v. Maldonado*, No. 22-1077, 2024 WL 4562728, at *1 (2d Cir. Oct. 24, 2024) ("A judgment of acquittal may be granted only if 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" (quoting *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005))); *Pugh*, 945 F.3d at 19 ("The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008))).

In determining whether the evidence is sufficient, courts "'view the evidence presented in the light most favorable to the government[,]' and '[a]ll permissible inferences must be drawn in the government's favor.'"  *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (alterations in original) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)); *see United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024) ("[W]hen reviewing the sufficiency of the evidence, '[courts] must view the evidence in the light most favorable to the [g]overnment'" while "'crediting every inference that could have been drawn in the [g]overnment's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" (quoting *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015)).  Under this inquiry, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

6

essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *United States v. Davis*, 122 F.4th 71, 75 (2d Cir. 2024) ("We will uphold the jury's verdict 'if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020)); *United States v. Zhong*, 26 F.4th 536, 560 (2d Cir. 2022) ("A defendant . . . cannot prevail on a sufficiency-of-the-evidence challenge 'if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011))); *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) ("Only if 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt' may the court enter a judgment of acquittal." (quoting *Guadagna*, 183 F.3d at 130)). "[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).

### b.    The Court denies Tarshish's motion for a judgment of acquittal

The Court understands Tarshish to argue that the Court should grant a judgment of acquittal because the government has neither "shown that there was an intent to cause a loss to the bank," (Trial Tr. 2521:20–21), or "that the defendants intended to obtain money or property from the bank," (*id.* at 2522:1–2). In support, Tarshish contends that *Ciminelli* and "other cases that have . . . validated the right to information theory" supported "the core of [his] argument." (*Id.* at 2521:16–19.) Tarshish also argues that the Second Circuit case law requires that "the misrepresentation has to go to the core of a bargain, which is, here, the value of the property." (*Id.* at 2523:6–10.) In support, Tarshish argues there was no testimony that the

property "price would have been higher had the short sale not occurred," (*id.* at 2523:10–15), or "that there was another offer to buy this property from the bank," (*id.* at 2523:16–18). As to bank fraud, Tarshish also argues that "to obtain money or property that is in the custody or control of the bank," (*id.* at 2523:22–23), requires receiving the money or property himself — "not merely just to . . . get [the bank] to give up an interest," (*id.* at 2523:24–25).

The government argues that the Court should deny Tarshish's motion for a judgment of acquittal. In support of its opposition, the government argues that it presented sufficient evidence, including "testimony from a number of witnesses that the payments to homeowners is evidence that there was additional money that was available to go to lenders and should have gone to lenders," (*id.* at 2522:10–13), and that the lenders "would have demanded that that money be paid to repay the [outstanding] loans" had the lenders known about these additional payments, (*id.* at 2522:14–16). The government also argues that "evidence that there were same-day flips" shows "intent to defraud the loan holders out of money that they were owed and that was available to be paid for these properties with respect to these short sales." (*Id.* at 2522:17–21.) As to bank fraud, the government argued that they presented "a variety of property interests" where banks and/or loan holders "lost money because of the defendant's fraudulent acts." (*Id.* at 2522:25–2523:3.) The government also argues that "there was no possibility for other offers because [Defendant] controlled the process from the beginning . . . ." (*Id.* at 2524:2–3.) In support, the government argues the evidence shows that Tarshish was "pretending to list the property on the market when they did not," (*id.* at 2524:3–4), "bribing the homeowners so that there was no ability for other offers to come in," (*id.* at 2524:4–6), and "damage[ing] the properties . . . to make them look uninhabitable and have a . . . lower market value," (*id.* at 2524:7–9).

"The elements of wire fraud are: '(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme.'" *Jabar*, 19 F.4th at 76 (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)); *United States v. Cooper*, No. 22-2709, 2024 WL 4533335, at *1 (2d Cir. Oct. 21, 2024) (same); *see also United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (stating that the first element of wire fraud is a "scheme to defraud"); *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) ("The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." (citing *United States v. Zagari*, 111 F.3d 307, 327 (2d Cir. 1997))). "Similarly, the federal bank fraud statute criminalizes the knowing execution of a scheme to defraud a financial institution." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (quoting *United States v. Bouchard*, 828 F.3d 116, 123 (2d Cir. 2016) (internal quotation marks omitted)); *see also Shaw v. United States*, 580 U.S. 63, 65 (2016) (discussing that the bank fraud statute makes it a crime "knowingly [to] execut[e] a scheme . . . to defraud a financial institution" (alterations in original)); *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992) (explaining that "the bank fraud statute should be read expansively and, where it dovetails with the mail and wire fraud statutes, we look to precedents arising under those statutes to inform our interpretation of such amorphous phrases").

The Second Circuit has held that the "scheme to defraud" element requires "proof that defendants possessed a fraudulent intent" and proof that "defendants must either intend to harm their victim or contemplate that their victim may be harmed." *United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021) (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)); *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) ("[T]he gravamen of the [wire fraud] offense is the scheme to defraud." (quoting *Greenberg*, 835 F.3d at 305)); *Bouchard*, 828 F.3d at 123

(discussing how the bank fraud statute "criminalizes schemes to defraud, or schemes to obtain the money of, a 'financial institution'").  "Fraudulent intent may be inferred '[w]hen the "necessary result" of the actor's scheme is to injure others.'"  *Jabar*, 19 F.4th at 76 (alteration in original) ("Essential to a scheme to defraud is fraudulent intent" (quoting *United States v. D'Amato*, 39 F.3d 1249, 1256–57 (2d Cir. 1994))); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970)) (finding that the mail fraud statute required "evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful" (citing *Horman v. United States*, 116 F. 350, 352 (6th Cir. 1902))); *see also Shaw*, 580 U.S. at 65, 66–70 (discussing how the "bank fraud statute's definition of fraud reflects the common law"); *Calderon*, 944 F.3d at 85 ("The wire and bank fraud statutes do not criminalize every deceitful act, however trivial.").  "Intent may also be proven 'through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false.'"  *Jabar*, 19 F.4th at 76 (quoting *Guadagna*, 183 F.3d at 129); *Guadagna*, 183 F.3d at 129 ("[D]irect proof of defendant's fraudulent intent is not necessary.").  "'[T]he government is not required to prove that an intended victim was actually defrauded' to establish guilt of mail or wire fraud."  *Weaver*, 860 F.3d at 97 (quoting *Starr*, 816 F.2d at 98); *Jabar*, 19 F.4th at 77 ("Proof of actual injury to the victim is not required because the scheme need not have been successful or completed." (citing *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996))).

Misrepresentations amounting only to deceit must be coupled with contemplated harm to the victim.  *Jabar*, 19 F.4th at 76 ("Because an intent to deceive alone is insufficient to sustain a wire fraud conviction, '[m]isrepresentations amounting only to a deceit . . . must be coupled with a contemplated harm to the victim.'" (alteration in original) (citing *Starr*, 816 F.2d at 98)); *Gatto*,

10

986 F.3d at 113 ("Accordingly, defendants must either intend to harm their victim or contemplate that their victim may be harmed." (citing *Starr*, 816 F.2d at 98)); *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) ("[T]he government 'must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims.'" (quoting *Starr*, 816 F.2d at 98)); *Guadagna*, 183 F.3d at 129 ("[T]he deceit must be coupled with a contemplated harm to the victim." (citing *Starr*, 816 F.2d at 98)); *Starr*, 816 F.2d at 98 ("Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims.  Only a showing of intended harm will satisfy the element of fraudulent intent."). The government must also prove that the defendant's misrepresentations were material.  *Neder v. United States*, 527 U.S. 1, 4 (1999) ("[W]e hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes"); *Calderon*, 944 F.3d at 85 ("[T]o sustain a conviction under the[] [wire and bank fraud] statutes, the [g]overnment must prove that the defendant in question engaged in a deceptive course of conduct by making *material* misrepresentations" (citing *Neder*, 527 U.S. at 4)); *Guadagna*, 183 F.3d at 132 (explaining that "[t]he government could have met its burden [to establish wire fraud], however, by showing that [the defendant] knowingly made material misrepresentations." (citing *United States v. Smith*, 133 F.3d 737, 743 (10th Cir. 1997))).  A misrepresentation is material when it is "reasonably likely to influence the [bank] in making a determination required to be made."  *Calderon*, 944 F.3d at 85 (alteration in original) (quoting *United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007)); *see also Neder*, 527 U.S. at 4 (explaining that a material representation has "a natural tendency to influence, or [is] capable of influencing, the decision of the [decision-making] body to which it [is] addressed." (first alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995))); *United*

*States v. Vidal*, No. 22-2857-CR, 2024 WL 397630, at *2 (2d Cir. Feb. 2, 2024) (noting that the misrepresentations were material where the "misrepresentation could have, or did, influence [the bank's] decision to allow [defendant] to reach the funds at issue." (quoting *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998))).

A scheme to obtain the money of a financial institution includes a scheme to obtain the money or property itself. *See* 18 U.S.C. § 1344(2) (criminalizing a scheme "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution"); *Ciminelli*, 598 U.S. at 309, 316 (explaining that the federal fraud statutes reach only "traditional property interests" and that "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest" and therefore could not form the basis for a wire fraud conviction); *Pasquantino v. United States*, 544 U.S. 349, 356 (2005) (explaining that "property" should be given its "ordinary or natural meaning" (quoting *Leocal v. Ashcroft,* 543 U.S. 1, 9 (2004)); *United States v. Mansouri*, No. 22-CR-34, 2023 WL 8430239, at *4 (W.D.N.Y. Dec. 5, 2023) (denying a motion to dismiss the indictment in a wire and bank fraud case where the financial institution's monetary losses "were reimbursable" because "actual loss is not necessary for a fraud conviction"); *United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023) (explaining that *Ciminelli* was inapplicable where "the indictment plainly alleges a scheme to obtain 'money or property,' not a scheme to deprive a bank of 'valuable economic information'"); *United States v. Weigand*, 482 F. Supp. 3d 224, 232, 235–36 (S.D.N.Y. 2020), *as corrected* (Sept. 2, 2020) (explaining that, even when a bank merely assumes possession of a customer's credit funds, the bank "has a 'special qualified property' right in the account" in a case where defendants and their co-conspirators "used . . . fictious businesses to fool the banks

into approving marijuana credit card and debit card sales by disguising those transactions as sales of dog food and the like").

### i.   Tarshish intended to cause a loss to lenders

The government's evidence at trial was sufficient to establish beyond a reasonable doubt that Tarshish intended to cause harm to lenders in violation of the wire and bank fraud statutes. The government presented the testimony of Collin Zacek, a representative from Fannie Mae, who testified regarding Fannie Mae's expectations of those involved in short sale transactions with the company.  Zacek testified that, as a guarantor of the mortgages, Fannie Mae covers losses related to a mortgage.  (Trial Tr. 1025:16–18 ("So we ensure that the loss is — if there is a loss on the mortgage that we — ultimately it falls on us as a company to cover the loss or eat the loss.").)  He also testified regarding Fannie Mae's requirements of those involved in short sale transactions.  (*See id.* at 1037:16–20, 1032:8–24.)  Zacek testified "any funds[] part of the [short sale] transaction have to be fully disclosed on that [HUD-1] form."  (*Id.* at 1037:16–20.)  He also testified that Fannie Mae required that short sale properties be "listed by an agent who is not the seller on MLS [Multiple Listing Service] for at least five days," (*id.* at 1032:10–12), that the "transaction be . . . [at] arm's length," (*id.* at 1032:14), that "[i]t cannot be a transaction involving any parties that . . . already have a prearrangement in kind as to what to do with the property after the fact," (*id.* at 1032:18–20), that "everything must be fully disclosed and documented to [Fannie Mae]," (*id.* at 1032:21), and that "[t]he buyer and seller cannot receive funds from the transaction unless the seller is applying for location assistance and that has a limit as well," (*id.* at 1032:22–24).  Fannie Mae's requirements prohibited the buyer and seller from being "related familially or through [a] commercial enterprise," (*id.* at 1035:9–11), or having "any type of business arrangement or relationship prior to the [short sale] transaction

commencing," (*id.* at 1035:15–16).  Zacek testified that not complying with these requirements "also affects Fannie Mae and the taxpayers because [they] would be taking a bigger loss," (*id.* at 1033:13–14), and that Fannie Mae "suffer[ed] a loss in connection" with shorts sale transactions involving Tarshish, (*id.* at 1036:10–17, 1105:12–14).  Similarly, Dean Meyer, a representative from Freddie Mac, testified that Freddie Mac wanted to "make sure the house is evaluated, make sure it's marketed, [and] make sure that all of the financial terms of that [short sale] contract are identified and publicly stated on that HUD-1 statement" in order "to ensure [Freddie Mac is] losing as little money as possible."  (*Id.* at 2045:13–19.)  In addition, Gina Feezer, a representative from Ocwen Financial Corporation, testified that Ocwen required homeowners to market their homes as part of the short sale process, (*id.* at 1218:12–14), and that the affidavits submitted in connection with the short sale were truthful, (*id.* at 1221:3–1222:3).  She testified that Ocwen "want[ed] to get as many offers for th[e] propert[ies] so that we — so that when we go to make this final decision over the amount, that we can lessen the loss for the investor as much as possible."  (*Id.* at 1227:2–5; *see also* GX 4275 (emails between Tarshish and others regarding final settlement amounts and short sale "approval, [HUD] and the hardship letter" for 3259 Decatur Avenue).)

Feezer also testified that interior damage to a home "makes it [the BPO] go down tremendously."  (Trial Tr. 1354:12–15.)  Belinda Brandimarti and Emilienne Brown, Tarshish's employees, testified that Tarshish would coordinate with others to take actions that would lower the property value of short sale properties.  (*Id.* at 1850:1–3, 1880:3–1881:17, 1375:9–17, 1467:16–25.)  Brandimarti testified at trial that getting a property BPO "ready" or "pretty" meant damaging the house so "the value [of the property] would become lower," (*id.* at 1880:3–1881:17), and that Tarshish would ask "Tony" to "make the houses pretty for the BPOs," (*id.* at

14

1881:3–9; *see also* GX 4243 (emails between Tarshish and others about ensuring that 177 Lewis was "bpo ready prior to bpos").)  Brown testified that they would "wait for a BPO to expire" so that "the price that the bank came up with during their BPO" would be "lower," (Trial Tr. 1375:9–17), "vacat[e] the homes that [they] were processing through short sales," (*id.* at 1467:22–23), and "backdat[e] the listing on the properties to make them appear as if they've been on the market longer than they actually had," (*id.* at 1467:23–25).  Based on the evidence presented, a rational juror could conclude that Tarshish "intend[ed] to harm the[] [lenders] or contemplate[d] that their victim may be harmed."  *Gatto*, 986 F.3d at 113 (quoting *Starr*, 816 F.2d at 98); *United States v. Hild*, 644 F. Supp. 3d 7, 16, 26 (S.D.N.Y. 2022) (finding that the government presented sufficient evidence for the jury to conclude the defendant deceived lenders in a securities, wire, and bank fraud case "by negotiating loan agreements under which the valuation of a [financial institution's] bond portfolio was based on purported market prices set by an independent third party," when the valuation was "in reality, based on [the defendant's] company's internal, above-market pricing assumptions").

### ii.    Tarshish made material representations on which lenders relied

The government's evidence at trial was sufficient to establish beyond a reasonable doubt that Tarshish made material representations to lenders as to the nature of the short sale transactions in violation of the wire and bank fraud statutes.  Aronov testified that he, Tarshish, and others "paid homeowners money that the bank wasn't aware of," (Trial Tr. 383:6–7), "would flip properties the same day at the table for profit," (*id.* at 383:9–10), and split the profits, (*id.* at 517:5–9).  (*See id.* at 383:11–20.)  He testified about the flip of 1219 Jefferson Avenue, (*id.* at 450:16–451:5), the flip of 1055 Herkimer Street, (*id.* at 516:5–18), and about preventing the listing of 2403 Dean Street on an auction website for the public to bid on, (*id.* at 622:3–624:4).

15

He also testified about Tarshish's involvement with short sale transactions, (*id.* at 395:18–22 ("Q And so who was responsible for [approaching homeowners about short sales]?  A Ron Borovinsky, Michael Gendin, Avi Tarshish, and some others.")), and Tarshish's role at My Ideal Properties, (*id.* at 421:2–12, 421:24–422:1).  Similarly, Christina Catarelli, an agent for Exclusive Homes, testified that the short sale affidavit for 177 Lewis Avenue contained false statements because not "[a]ll amounts paid to any person or entity" were reflected on the HUD-1 settlement statement, (*id.* at 1653:11–16), and there was a pre-existing "agreement[], understanding or contract[]  relating to the current sale or subsequent sale of the property," (*id.* at 1653:3–8).  She also testified regarding Tarshish's role in the transaction, including receiving a percentage of profits from the sale of 177 Lewis Avenue.  (*Id.* at 1601:1–23.)  The government also presented testimony from Zacek that Fannie Mae would have declined short sale transactions if it was aware of such misrepresentations, (*id.* at 1051:7–1052:12), testimony from Meyer that Freddie Mac would not authorize servicers to approve a short sale unless the sale complied with Freddie Mac's criteria, (*id.* at 2048:25–2049:2), and testimony from Feezer that "any type of misrepresentation that was not stated to [Ocwen] . . . could have been detrimental to the decision that the investor made with respect to making the sale," (*id.* at 1243:25–1244:7).

Tarshish argues that "the law in the Second Circuit . . . [requires] that the misrepresentation has to go to the core of the bargain" and the government presented no evidence that there were misrepresentations that went to "the value of the property."  (*Id.* at 2523:6–18).  However, the government presented testimony from Brandimarti that Tarshish would ask "Tony" to "make the houses pretty for the BPOs," which would lower the property value, (*id.* at 1881:3–17), and testimony from Catarelli that Tarshish used the term "BPO ready," which meant "[they] got into the property and made the property in the worse possible condition

[they] could," (*id.* at 1583:25–1584:8).  The government also presented testimony from Feezer that interior damage to a home "makes it [the BPO] go down tremendously," (*id.* at 1354:12–15), and testimony from Catarelli and Brown that lenders relied on BPOs in evaluating short sale offers, (*id.* at 1583:21–25, 1498:19–22 ("Q And the BPO was doing what was necessary to get done before a lender could consider a short sale offer; is that right?  A Yes.")).  Based on the evidence presented, a rational juror could conclude that Tarshish made material misrepresentations that were "reasonably likely to influence the [bank] in making a determination required to be made."  *Calderon*, 944 F.3d at 85 (quoting *Rigas*, 490 F.3d at 234); *Vidal*, 2024 WL 397630, at *2  (explaining that the misrepresentations were material where "the lenders' disbursement of funds was conditioned on [the defendant's] commitment to sell particular vehicles").

### iii.  Tarshish intended to obtain money or property from a bank

The government's evidence at trial was sufficient to establish beyond a reasonable doubt that Tarshish intended to obtain the money or property from a financial institution in violation of the bank fraud statute.  First, the government presented the testimony of Zacek, who testified that Fannie Mae owned outstanding loans when homeowners fell more than ninety days behind their payments.  (Trial Tr. 1026:8–16.)  Zacek also testified that a homeowner "receiving extra payments on the side . . . would mean that we're probably taking a bigger loss than we should because that fund . . . should be added to the sale price and coming to us instead . . . ."  (*Id.* at 1041:6–10.)  He testified that Fannie Mae learned of "undisclosed business relationships between the parties" involved in this case.  (*Id.* at 1036:10–15 ("Q From 2013 to 2018, did Fannie Mae learn of undisclosed business relationships between the parties we were talking about more than ten times?  A Yes.  Q More than 50 times?  A Yes.").)  Zacek also testified that

Fannie Mae allowed the short sales of 1319 Jefferson Avenue and 1055 Herkimer Street to proceed, and that Fannie Mae "suffer[ed] a loss in connection with 1319 Jefferson Avenue and 1055 Herkimer Street" as a result.  (*Id.* at 1105:1–14; *see also* GX 4275 (emails between Tarshish and others regarding the short sale "approval, hud and the hardship letter" for 3259 Decatur Avenue where a co-conspirator "suggest[ed] u [sic] all stop with these emails and use some brains" because "there are other ways to ask and to confirm" the commission amounts specified on the HUD); GX 4264 (emails copying Tarshish and others regarding the BPO for 1055 Herkimer Avenue); GX 2045-C (emails approving the short sale of 1319 Jefferson Avenue); GX 2001 (short sale settlement agreement for 1055 Herkimer Avenue).)  Second, the government presented testimony from Aronov that the short sale affidavits for 1055 Herkimer Avenue and 1319 Jefferson Avenue were false.  (Trial Tr. 577:24–579:25, 687:20–23, 693:3–695:5.)  Third, the government presented testimony from two homeowners about receiving money in connection with the short sale transactions.  (*Id.* 974:4–975:2, 978:20–979:4, 2154:22–24, 2158:14.)  Edwin Lewis, the owner of 1319 Jefferson Avenue, testified that he received more than twenty-thousand dollars for the short sale of 1319 Jefferson Avenue.  (*Id.* at 974:4–975:2, 978:25–979:4.)  Rogelio Thomas, the owner of 1055 Herkimer Avenue, testified that he "was asked if [he] wanted any monies from the transactions."  (*Id.* at 2154:22–24, 2158:14.)  Fourth, the government presented testimony from employees who worked with Tarshish that "[he] was in charge of handling the money" and that companies Tarshish owned or others working with him would obtain property deeds in connection with short sale transactions.  (*Id.* at 1467:11–14, 1648:13, 1652:17–24.)  Catarelli, an agent who worked with Tarshish, testified that "[he] had complete control" over their short sale deals and the money.  (*Id.* at 1641:23–1642:17, 1648:13, 1652:17–24.)  Brandimarti, Tarshish's employee, testified that "almost all" of the short sale

18

closings involved paying cash to homeowners and that Tarshish would talk about "need[ing] cash to pay the homeowners at the closings." (*Id.* at 1875:15–1878:7.) Brown, Tarshish's employee, testified that homeowners would transfer property deeds to companies that he owned or to other employees and agents working with Tarshish. (*Id.* at 1467:11–14 ("Q Who is the deed being transferred to? A Eliya Properties LLC. Q Would you remind the jury what Eliya Properties LLC is? A An LLC that belongs to Avi Tarshish."), 1527:7–10.)

Tarshish argues that *Ciminelli* and "other cases that have . . . validated the right to information theory" supported "the core of [his] argument," (*id.* at 2521:16–19). However, the Court is unpersuaded that *Ciminelli* is relevant to the facts of this case. First, the Supreme Court in *Ciminelli* rejected the right-to-control theory of wire fraud that had been previously accepted by the Second Circuit. *Ciminelli*, 598 U.S. at 309 ("Because 'potentially valuable economic information' 'necessary to make discretionary economic decisions' is not a traditional property interest, we now hold that the right-to-control theory is not a valid basis for liability [for wire fraud].") ; *see also Sec. & Exch. Comm'n v. Govil*, 86 F.4th 89, 105 (2d Cir. 2023) (noting that the Supreme Court "rejected the right-to-control theory"). Second, as discussed in the February 2024 Decision, this is not a right-to-control theory case. (Feb. 2024 Decision.) The government presented testimony that Tarshish and others schemed to defraud others of money and real property, (Trial Tr. 974:4–975:2, 978:25–979:4, 1026:8–16 , 1036:10–15, 1467:11–14, 1648:13, 1652:17–24, 1105:12–14, 2154:22–24, 2158:14), based on fraudulently depressed property values, (*id.* at 1880:3–1881:17, 1375:9–17, 1467:16–25), and misrepresentations on short sale affidavits, (*see id.* at 406:4–9 ("A The affidavit wanted to make sure that all the parties that are involved in the transaction weren't all working together. And that the homeowner wasn't getting any money. Q Was that true in the case of the short sales that you were doing? A No.").

Accordingly, based on the evidence presented, a rational juror could conclude that Tarshish intended to obtain money or property from banks in connection with the short sale transactions. *See* 18 U.S.C. § 1344(2) (criminalizing the "knowing[] execut[ion]" of a scheme "to obtain any of the moneys, . . . securities, or other property" under the control of a bank); *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 469 (2019) (explaining that the debt resulting from a home purchase "is backed up by a 'mortgage' — a security interest in the property designed to protect the creditor's investment" (citing Restatement (Third) of Property: Mortgages § 1.1 (1996))); *Pasquantino,* 544 U.S. at 356 (explaining that "property" extends "to every species of valuable right and interest" (quoting Black's Law Dictionary 1382 (4th ed. 1951))); *United States v. Turk*, 626 F.3d 743, 751 (2d Cir. 2010) (finding that "the item of value lost by [the defendant's] victims [in the mortgage fraud scheme] was the unpaid principal of the loans, not the buildings themselves" when calculating the loss amount after the defendant's wire fraud conviction); *United States v. Nawaz*, 555 F. App'x 19, 23 (2d Cir. 2014) (affirming the defendant's conspiracy and wire fraud convictions because the defendant had knowledge of and engaged in the charged mortgage fraud scheme where the mortgage loan company "lost significant sums in the form of loan proceeds in connection with the sham sales"); *see also United States v. An*, 733 F. Supp. 3d 77, 93–94 (E.D.N.Y. 2024) ("The presumed profit to the bank from maintaining and protecting the funds in the customer accounts is a property interest."); *United States v. Porat*, 76 F.4th 213, 221 (3d Cir. 2023) (finding that "the statutory text [of the wire fraud statute] and the case law do not" require a defendant "to *personally obtain* money or property from his victims"); *United States v. Mansouri*, No. 22-CR-34, 2023 WL 9100641, at *6 (W.D.N.Y. June 29, 2023) (explaining that the "fraudulent loan applications invoked traditional property interests" in a wire and bank fraud case because "[t]he object of

defendant's fraud . . . was money that belonged to the financial lenders"), *report and recommendation adopted*, 2023 WL 8430239 (W.D.N.Y. Dec. 5, 2023); *Kelly v. United States*, 590 U.S. 391, 402 (2020) (noting that cost of an employees' services "qualif[ies] as an economic loss to the city, sufficient to meet the federal fraud statutes' property requirement," "[n]o less than if the official took cash out of the city's bank account would he have deprived the city of a 'valuable entitlement.'" (citing *Pasquantino*, 544 U.S. at 357)); *Weigand*, 482 F. Supp. 3d at 232, 235–36 (S.D.N.Y. 2020) (explaining that where "the indictment sufficiently stated an intent to harm [the bank's] property interests" the question of "whether the banks also had a 'right to accurate information,' 'ethereal' or otherwise, is beside the point").

### III.  Conclusion

For the foregoing reasons, the Court denies Tarshish's motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

Dated:  February 10, 2025
　　　　Brooklyn, New York

                              SO ORDERED:


                              _____s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge